UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

OSVALDO VALENTIN,                    :
                                     :
     Plaintiff,                      :
                                     :
     v.                              :    CASE NO.  3:17cv944(DFM)
                                     :
NANCY A. BERRYHILL,                  :
ACTING COMMISSIONER OF               :
SOCIAL SECURITY,                     :
                                     :
     Defendant.                      :

RULING AND ORDER

The plaintiff, Osvaldo Valentin, seeks judicial review pursuant to 42 U.S.C. § 405(g) of a final decision by the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits ("SSDI") and supplemental security income ("SSI"). The plaintiff asks the court to reverse the Commissioner's decision or, alternatively, remand for a rehearing. (Doc. #22.) The Commissioner, in turn, seeks an order affirming the decision. (Doc. #23.) For the reasons set forth below, the plaintiff's motion is denied and the defendant's motion is granted.[1]

I.   Administrative Proceedings

In April 2013, the plaintiff filed applications for SSDI and SSI alleging that he had been disabled since June 2012. His applications were denied initially and upon reconsideration and he requested a hearing before an Administrative Law Judge ("ALJ"). On

_____

[1]This is not a recommended ruling. The parties consented to the jurisdiction of a magistrate judge. (Doc. #19.)

June 5, 2015, the plaintiff, represented by counsel, testified at the hearing. A vocational expert also testified. On July 24, 2015, the ALJ issued a decision finding that the plaintiff was not disabled. On April 13, 2017, the Appeals Counsel denied review, making the ALJ's decision final. In June 2017, the plaintiff commenced this action. On December 16, 2017, the plaintiff filed a motion for reversal or remand and on February 6, 2018, the defendant filed a motion to affirm. (Doc. ##23, 24.)

## II. Factual Background

The plaintiff, born in 1963, was 48 years old at the time of his alleged onset date[2] of June 1, 2012. (R. at 34.) He had completed one year of college and also had some vocational training. (R. at 300.) Last employed in 2012 at Home Depot cutting lumber, he stopped working because "it was a seasonal job." (R. at 182.) Prior to that, he was employed as a laborer for various construction companies. (R. at 183.)

### A. Medical Evidence[3]

2011

On March 4, 2011, the plaintiff was seen at a foot clinic, complaining of right ankle pain for the past year, "worse on

---

[2]The onset date is the first day an individual is disabled as defined in the Social Security Act and the regulations. SSR 83-20, 1983 WL 31249, at *1 (1983).

[3]The court has reviewed the plaintiff's entire medical record and incorporates the parties' Joint Stipulation of Facts herein. Doc. #22-1.

ambulation." (R. at 257.) He stated that the pain was a six on a scale of ten. The podiatrist's impression was right ankle sprain and pes planus (flat foot). (R. at 257.) An x-ray of the right ankle showed an old healed fracture of the distal fibula. There was "periosteal thickening of the distal fibula laterally and medial to the distal tibia which may represent heterotopic ossification from old trauma." There was "a small corticated calcified density medial to the medial malleolus and a posterior calcaneal spur with a linear lucency." (R. at 259.)

On June 13, 2011, the plaintiff was seen by orthopedist Dr. Colleen Fay for pain in his right leg. (R. at 254.) X-rays of the plaintiff's right hip and knee revealed mild joint space narrowing. Dr. Fay assessed the plaintiff with osteoarthritis of the right hip and knee and referred him to physical therapy. (R. at 254-45.)

In August 2011, the plaintiff had physical therapy. He said he had pain in his right ankle and that his right knee buckled. (R. at 243.) The ankle pain was inconsistent, dull, and worse in the evening after walking or at the end of a long day. (R. at 243.) He reported that his symptoms were affecting his daily life because he worked as a laborer and he was "not sure" if he could climb up ladders "because of the pain." (R. at 243.) Notes reflect that the plaintiff walked "with no assistance." (R. at 243.) On August 10, 2011, the plaintiff reported right knee pain rated at a six and right foot pain as a five on a scale of one to ten. (R. at 242.)

He said his ankle pain was aggravated by walking. (R. at 242.) He had right ankle tightness and weakness in the right ankle, foot and knee. (R. at 242.) On August 12, 2011, the plaintiff reported continued right knee buckling secondary to weakness, but no pain. He said his symptoms were improving. (R. at 241.) On August 17, 2011, the plaintiff reported right knee pain with stiffness and weakness. (R. at 240.)

2012

On January 20, 2012, Dr. Fay referred the plaintiff for additional physical therapy. (R. at 251.)

2013

On February 25, 2013, an MRI of the plaintiff's brain revealed sinus disease, atrophy with ventriculomegaly[4] and sulcal dilatation, and hyperintensity periventricular and subcortical regions. (R. at 264, 288, 362.)

On July 23, 2013, the plaintiff saw APRN Ravneet Bharara for a physical examination and to establish primary care. (R. at 314-19.) He reported having a tremor in his right hand for about six months and said that his hand shakes if he tries to hold something. (R. at 314.) The plaintiff also complained of slight pain in the bottom of his left foot especially when he takes a step. (R. at 314.) He denied any muscle aches, joint pain or

_____

[4]"Ventriculomegaly occurs when fluid-filled structures of the brain are too large." Brooks v. Comm'r of Soc. Sec., No. 2:13CV179 2014 WL 4346903, at *6 (M.D. Fla. Sept. 2, 2014).

stiffness.  APRN Bharara observed that the plaintiff had normal gait, balance, strength, and muscle tone.  (R. at 318.)  She assessed him with obesity and tremor in the right hand. (R. at 318.)

On August 12, 2013, the plaintiff was examined by Dr. Yakov Kogan, a state agency consultant.  The plaintiff told Dr. Kogan that he had had a tremor in his "right upper extremity" for a year. The plaintiff said he noticed the tremor mainly when performing postural or intentional activities such as holding a cup of coffee. (R. at 265.)  He took Primidone and Mysoline to manage his tremor. (R. at 265.)  The plaintiff also reported "gait instability" for approximately one year. (R. at 265.)  He gave a history of right hip, knee, and ankle pain for about one year, exacerbated with prolonged standing, walking and carrying.  (R. at 265.)  The plaintiff said he had had left heel pain with prolonged standing or walking for the past month. (R. at 265.)

Dr. Kogan reviewed an MRI of the plaintiff's brain.  On examination, Dr. Kogan observed that the plaintiff had a moderate to severe intention tremor of the right upper extremity on finger-nose-finger testing.[5]  However, when the plaintiff was distracted (such as when asked to place his right pinky finger onto his left

---

[5]In the finger—nose—finger test, the patient is asked to alternately touch their nose and the examiner's finger as quickly as possible.  Hal Blumenfeld, Neuroanatomy Through Clinical Cases 69-70 (2d ed. 2010).

earlobe), the intention tremor "completely disappear[ed]." (R. at 266.) The plaintiff had no significant tremor when "manipulating his personal items or lacing his shoe laces." (R. at 266.) Dr. Kogan found no tremor of the left upper extremity or the bilateral lower extremities. (R. at 266-67.) The plaintiff's sensation was intact and he had no dysmetria[6] in the upper or lower extremities bilaterally. His gait was normal. (R. at 267.) Dr. Kogan noted that the plaintiff's right upper extremity tremor had "multiple non-organic features such as: 1) present with intention but not posturally, and 2) resolved with distraction." (R. at 267.) Dr. Kogan concluded that "[w]ork related limitations, therefore could not be established." (R. at 267.) Dr. Kogan found "no signs of parkinsonism (no resting tremor, no rigidity, no bradykinesia, and no gait instability)." (R. at 267.) With regard to the plaintiff's musculoskeletal system, Dr. Kogan noted that the plaintiff had "no range of motion deficits and no neurological deficits that limited sitting, standing, walking, bending, lifting, carrying, reaching, or fine finger manipulations." (R. at 267.) Dr. Kogan concluded that "[w]ork related activities involving standing, walking, and carrying are mildly limited on the basis of subjective right hip, knee, and ankle pain and left heel pain." (R. at 267.)

---

[6]Dysmetria refers to improper estimation of distance in muscular acts, often resulting in overreaching. Dorland's Illustrated Medical Dictionary 586 (31st ed. 2007).

On August 23, 2013, the plaintiff was seen by APRN Bharara. He reported that there was "no change" in his hand tremor and that he was having a hard time doing anything with his right hand -- he said he was not able to hold things, not able to sign his name, and dishes fell from his hand. (R. at 322.) The plaintiff also said that his right leg bothered him, especially when he walked. (R. at 322.) APRN Bharara assessed him with arthralgia[7] in right hip/knee and ankle and tremor in right hand and referred him to a neurologist. (R. at 323.)

On September 4, 2013, state agency medical consultant Anita Bennett, M.D., reviewed the evidence in the file and concluded that the plaintiff retained the capacity to frequently lift and carry 25 pounds and occasionally 50 pounds, sit for six hours, stand/walk for six hours, and perform occasional fine manipulative tasks (fingering) with the right upper extremity. (R. at 387-93.) Dr. Bennett noted there was evidence of very mild osteoarthritis of the right hip and right knee, with no abnormal findings on examination, and there was also evidence of a mild intention tremor of the right hand. (R. at 392.) Dr. Bennett stated that the plaintiff's handwriting on the Activities of Daily Living form showed evidence of a tremor but was still legible. (R. at 392.)

When seen by APRN Bharara on September 6, 2013, review of

---

[7]Arthralgia refers to pain in a joint. Stedman's Medical Dictionary 159 (28th ed. 2006).

systems was negative, and physical examination was unremarkable. (Jt Stip ¶15.) She listed his active problems as: obesity; tobacco use disorder; and tremor. (R. at 324.) Xrays of the plaintiff's right hip and knee were unremarkable with no degenerative changes. (R. at 326-27.)

In October 2013, APRN Bharara indicated on a State of Connecticut form for Medicaid and SAGA Cash Benefits that the plaintiff's diagnoses were tremors and obesity and that he would be unable to work for two to six months. (R. at 305.)

On November 22, 2013, state agency medical consultant Lois Wurzel, M.D., reviewed the evidence in the file. She stated that the plaintiff had a "mild intention tremor of his right hand" that was "treated medically." (R. at 407, 410.) She further noted that imaging showed "evidence of old fractures and bone spurs of the right lower extremity." (R. at 407.) Dr. Wurzel determined that the plaintiff could frequently lift and/or carry 25 pounds and occasionally 50 pounds and sit, stand and/or walk 6 hours in an eight hour day. With regard to "fingering," the plaintiff was limited to "occasional fine manipulative tasks with his right upper extremity." (R. at 409.)

On February 11, 2014, the plaintiff was examined by Dr. Jianhui Zhang, a neurologist. The plaintiff complained of bilateral hand tremors, right greater than left, for the past year. (R. at 329.) He noticed that the tremor worsened when he tried to

reaching for things like cups or utensils, and he had trouble writing. (R. at 329.) He said the tremor subsided when he put pressure on his hand. (R. at 329.) The plaintiff told Dr. Zhang that he had trouble walking and was unsteady on his feet. (R. at 329.) He denied numbness or weakness. (R. at 329.) He reported using alcohol, but not on a daily basis.

Dr. Zhang observed that the plaintiff's gait was normal. The plaintiff's balance, muscle tone, and motor strength in upper and lower extremities all were normal. Dr. Zhang saw "no involuntary movements." (R. at 330.) A sensory examination revealed intact pain and temperature sensation, and normal proprioception. (R. at 330.) The plaintiff's reflexes were 1+ throughout, except for no ankle jerk or Babinski reflexes[8] bilaterally. (R. at 330.) The plaintiff's orientation, memory, attention, language, and fund of knowledge were normal. (R. at 330.) Dr. Zhang's assessment was "familial (benign essential) tremor, abnormal brain scan, and abnormality of walk." (R. at 330.) Dr. Zhang stated that there were "two separate issues: Tremor, appears to be benign essential tremor [and] abnormal gait, likely due to peripheral neuropathy giving decreased reflexes and abnormal sensation. He may have

---

[8]A Babinski response occurs when the toes curve upward and fan out in response to stimulation of the sole of the foot; it is abnormal and suggests damage to the tract transmitting neural impulses from the brain to the spinal cord. Stedman's Medical Dictionary 1766 (28th ed. 2006).

neuropathy secondary to ?ETOH[9] induced versus idiopathic or other causes." (R. at 330.) Dr. Zhang prescribed Primidone and Mysoline, and referred the plaintiff for a nerve conduction study of his legs to "assess neuropathy." (R. at 331.)

2014

On February 22, 2014, the plaintiff had an MRI of his brain, which showed "diffusely scattered white matter lesions most consistent with chronic demyelinating[10] plaque." (R. at 269.) It showed "a dominant subcortical lesion in the posterior left frontal lobe, which probably represented an area of active plaque or a recent infarct of approximately 2 to 4 weeks in age." (R. at 269.)

An EMG in March 2014 of the plaintiff's upper extremities indicated mild carpal tunnel syndrome, left greater than right. (R. at 271.)

On March 7, 2014, the plaintiff had a followup appointment with Dr. Zhang. (R. at 332.) Dr. Zhang noted that the plaintiff had "started on Mysoline for essential tremor" and that the plaintiff "thinks it helps partially." (R. at 332.) The plaintiff's gait was normal as were his balance, muscle tone, and

---

[9]ETOH (ethyl alcohol) refers to the type of alcohol found in alcoholic beverages. 1 The Gale Encyclopedia of Medicine 134 (5th ed. 2015).

[10]Demyelination refers to the loss or destruction of the protective covering (myelin sheath) that surrounds nerve fibers in the brain, optic nerves and spinal cord. Dorland's Illustrated Medical Dictionary 493 (31st ed. 2007).

motor strength in both upper and lower extremities. (R. at 333.)
Dr. Zhang opined that the plaintiff's brain MRI could indicate
ischemic disease[11] or demyelinating disease.[12]  (R. at 333.)  Dr.
Zhang assessed tremor, which appeared to be benign essential
tremor; and abnormal gait, for which he planned to rule out
multiple sclerosis.  (R. at 333.)

When seen next on August 12, 2014, the plaintiff told Dr.
Zhang that he thought the Mysoline was partially helping his
tremor.  He denied any side effects. (R. at 335.) Examination
revealed that the plaintiff was "unsteady on gait, unable to walk
on tip toes at right, mildly hemi-conducted gait at right."  (R. at
336.)

On September 11, 2014, the plaintiff completed a form for the
Connecticut Department of Social Services.  He listed his medical
conditions as "arthritis right ankle, knee and hip" and a tremor
"in his right hand."  (R. at 292.)  He reported that he lived
alone.  He could drive a car, but he walked or used Dial-a-Ride.
(R. at 296.)  He said that he was unable to work because his
writing hand shook and it was hard for him to write or hit a nail
with a hammer. (R. at 298, 302.)  The form asked the plaintiff to
assess how much time - "often," "sometimes" or "never" - he was

---

[11]Ischemic disease is when a blood vessel becomes blocked.
Stedman's Medical Dictionary 1001 (28th ed. 2006).

[12]A demyelinating disease is any condition that damages myelin.
Dorland's Illustrated Medical Dictionary 493 (31st ed. 2007).

able to do certain activities.   The plaintiff indicated "often" for the activities of sitting, standing, walking, bending, lifting, grasping, pushing, and pulling. (R. at 299.)   He stated that he could walk and used a cane. (R. at 299.)   He indicated that he could shop for food, cook, perform household chores, and exercise. (R. at 299.)

On October 8, 2014, APRN Charity Braden completed a medical statement for the State of Connecticut Department of Social Services. (R. at 292.)   She indicated that the plaintiff had a tremor, an abnormal brain scan, and gait disturbance.   She opined that the plaintiff would be able to return to work "6+ months from now." (R. at 292.)

On October 9, 2014, the plaintiff was seen by Dr. Zhang. (R. 338-40.) The plaintiff "said he has less tremor since Mysoline started." (R. at 338.)   Nerve conduction studies of the plaintiff's leg showed "mild neuropathy." (R. at 339.) The assessment was "MS; essential tremor, improving; and abnormal gait, combination of neuropathy with possible MS."  (R. at 340.)

That same day, Dr. Zhang completed a medical statement for the State of Connecticut Department of Social Services.   Dr. Zhang indicated that the plaintiff was unable to work due to "tremor, unsteady gait, and working diagnosis of MS." (R. at 291.)   He opined that the plaintiff's conditions would last "six months or more."  (R. at 291.)

An October 16, 2014 lumbar puncture indicated elevated protein and one gamma restriction band in the cerebrospinal fluid. (R. at 278, 282, 351.) Dr. Zhang noted that these results - along with the brain MRI - were consistent with MS. (R. at 282.)

On October 31, 2015, the Department of Social Services of the State of Connecticut approved the plaintiff's application for Medicaid and State General Assistance benefits. The "determination rationale" stated "tremors, unsteady gait, and question of MS." (R. at 293-94.)

On November 18, 2014, the plaintiff returned to Dr. Zhang for follow up. (R. at 341-43.) Dr. Zhang's assessment was "essential tremor; improving and abnormal gait; suspect MS." He continued Mysoline for tremor and provided a referral to an MS center.

B.    Plaintiff's Testimony

At the hearing before the ALJ, the plaintiff testified that he has a driver's license but does not drive because "gas costs money." (R. at 427.) He took a bus to the hearing. He explained that he is unable to work because he "can't walk," has "no balance," and his right "hand shakes." (R. at 429.) He has "no trouble with his left hand." He takes medication for the tremor but it does not help. (R. at 430.) The plaintiff testified that he has used a 4 prong cane for the past two years and that he "can't walk without it" because his "balance is not right." (R. at 432.) The plaintiff explained that it is easier to sit than walk.

13

He has difficulty writing.  He is able to dress himself but has to do it slowly. (R. at 443.)

### C.  Vocational Expert

Estelle Hutchinson, a vocational expert ("VE"), also testified.  The ALJ asked the VE to assume a hypothetical individual with the plaintiff's vocational factors and the residual functional capacity[13] of medium work[14] with occasional fingering or fine manipulation of tasks involving the right upper extremity. The VE testified that such an individual could perform unskilled medium jobs existing in the national economy including a hand packer, laundry worker, and cleaner.

## III. Statutory Framework

To be "disabled" under the Social Security Act and therefore entitled to benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner uses the following

---

[13]Residual functional capacity ("RFC") is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).

[14]Medium work is defined as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(c).

five-step procedure to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (internal alterations and citation omitted). "The applicant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

IV. The ALJ's Decision

Following the five step evaluation process, the ALJ first found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date of June 1, 2012. (R. at 14.) At step two, the ALJ determined that the plaintiff had severe impairments of osteoarthritis and a disorder of the nervous system with benign hand tremor. At step three, the ALJ found that the plaintiff's impairments, either alone or in combination, did not

meet or medically equal the severity of a listed impairment in 20
C.F.R. Pt. 404, Subpart P, Appendix 1.  (R. at 14.)  The ALJ next
determined that the plaintiff had

> the residual functional capacity to perform medium work
> as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except
> that he is further limited to occasional fingering or
> fine manipulation of tasks involving the right upper
> extremity.

(R. at 16)  At step four, the ALJ concluded that the plaintiff was
not capable of performing his past relevant work.  (R. at 19.)  At
step five, after considering plaintiff's age, education, work
experience and RFC, as well as the testimony of the VE, the ALJ
found that other jobs existed in significant numbers in the
national economy that the plaintiff could perform. (R. at 20.)
Accordingly, the ALJ determined that the plaintiff was not under a
disability from his alleged onset date of June 1, 2012 through the
date of the decision on July 24, 2015.  (R. at 21.)

V.   Standard of Review

This court's review of the ALJ's decision is limited.  "It is
not [the court's] function to determine de novo whether [the
plaintiff] is disabled." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir.
1996).  The court may reverse an ALJ's finding that a plaintiff is
not disabled only if the ALJ applied the incorrect legal standards
or if the decision is not supported by substantial evidence.
Brault v. Soc. Sec. Admin., 683 F.3d 443, 447 (2d Cir. 2012).  In
determining whether the ALJ's findings "are supported by

substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)). "Substantial evidence is more than a mere scintilla. . . . It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447 (quotation marks and citations omitted). It is "a very deferential standard of review — even more so than the clearly erroneous standard. . . . The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 447–48. See also Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence.") (internal quotation marks omitted).

VI.  Discussion

    A.  Step 2

    The plaintiff argues that the ALJ erred at step 2 in not finding the plaintiff's multiple sclerosis a severe impairment.

    At step two, "[a] claimant has the burden of establishing that [he] has a 'severe impairment,' which is 'any impairment or

combination of impairments which significantly limits [his] physical or mental ability to do basic work." Woodmancy v. Colvin, 577 F. App'x 72, 74 (2d Cir. 2014). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" Cobbins v. Comm'r of Soc. Sec., 32 F. Supp. 3d 126, 133 (N.D.N.Y. 2012). A "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Id. (citations omitted).

The ALJ found that the plaintiff had severe impairments of osteoarthritis and a disorder of the nervous system with benign hand tremor. The ALJ explained that Dr. Zhang suspected MS but there was no definitive diagnosis. (R. at 15.) The ALJ noted that the plaintiff's 2014 brain MRI showed white matter cortical changes suggesting demyelinating disease but observed the plaintiff's treatment records did not indicate that this "caused any acute factors." (R. at 17.) The ALJ observed that the record showed "essentially normal physical examination findings." (R. at 18.) The ALJ cited Dr. Kogan's assessment that in which he found no range of motion or neurological deficits that limited standing, walking, and carrying, concluding that such activities were only mildly limited on the basis of subjective pain in the right hip,

knee and ankle.  He also noted Dr. Zhang's treatment records which revealed essentially normal findings.  Substantial evidence supports the ALJ's evaluation of the plaintiff's impairments step 2.[15]

B.  Evaluation of Medical Opinion Evidence

The plaintiff argues that the ALJ erred in analyzing the medical evidence.  According to the plaintiff, the ALJ should have found that the plaintiff had unsteady gait, the need for a cane, and bilateral tremors.  If the ALJ had incorporated these limitations, the plaintiff argues, the ALJ would then have concluded that the plaintiff had "less than medium exertional residual functional capacity." (Doc. #22 at 14-15.)

The ALJ did not err.  The ALJ acknowledged the plaintiff's assertion that he is unsteady on his feet and requires a cane but concluded that the medical evidence did not substantiate these

_____

[15]Further, an ALJ's finding that an impairment is not severe at step two is harmless error when, as here, the ALJ finds other severe impairments and continues with the sequential evaluation, considering the combined impact of all impairments. See Dimauro v. Berryhill, No. 3:16CV1329(WIG), 2018 WL 3872154, at *6 (D. Conn. Aug. 15, 2018). In such a circumstance, "because the ALJ did find several severe impairments and proceeded in the sequential process, all impairments, whether severe or not, were considered as part of the remaining steps." Jones-Reid v. Astrue, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), aff'd, 515 F. App'x 32 (2d Cir. 2013). See, e.g., Rosa v. Colvin, No. 12CV0170, 2013 WL 1292145 at *7 (N.D.N.Y. Mar. 27, 2013) ("The ALJ's determination that Plaintiff's orthopedic conditions were not severe was based upon substantial evidence and therefore not error in this regard; even if it were error, however, the Commissioner is correct that it was a harmless error" because the ALJ "proceeded beyond step two of the analysis.").

claims.  To begin with, there is substantial evidence in the record that the plaintiff walked with a normal gait.  Both APRN Bharara and Dr. Kogan noted the plaintiff's normal gait.  (R. at 318, 267.) As to the use of a cane, there was no evidence in the record about the medical necessity for an assistive device and treatment records make no mention of a cane.  "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9P, 1996 WL 374185 (S.S.A. July 2, 1996). See Black v. Colvin, No. 3:16CV1727(MPS), 2017 WL 6485687, at *5 (D. Conn. Dec. 19, 2017) (Plaintiff's argument that he relies on a cane failed "because the evidence in the record does not establish that [the plaintiff's] use of a cane was medically necessary.") Addressing the plaintiff's contention that the ALJ should have found that the plaintiff suffered from bilateral tremors, substantial evidence supports the ALJ's finding that the plaintiff's tremor was limited to his right hand.  The plaintiff told APRN Bharara that he had a tremor in his right hand. (R. at 314.)  In a subsequent appointment, he indicated that he was having a "hard time doing anything with his right hand."  (R. at 322.) When examined by Dr. Kogan, the plaintiff reported that he had a

tremor in his right hand. (R. at 265.) Finally, at the hearing before the ALJ, the plaintiff testified that his right "hand shakes" and he has "no trouble with his left hand." (R. at 429.)

C. State of Connecticut Disability Determination

The plaintiff next argues that ALJ erred by neglecting to address the State of Connecticut's determination that the plaintiff is disabled. The plaintiff asserts that "when two governmental agencies reach opposite conclusions based on the same facts, statute and laws," the defendant's failure to "explain the differences in outcomes . . . merits reversal." (Doc. #22 at 26.)

In December 2014, the State of Connecticut Department of Social Services issued a one page "XIX/SAGA/GA Notice of Decision" with the boxes "disabled" and "unemployable" checked. (R. at 293.) The notice stated that the plaintiff had "tremors, unsteady gait, ? MS" and referred to the plaintiff's February 2014 brain MRI "showing diffusely scattered white matter lesions most consistent with chronic demyelinating plaques" and a "dominant subcortical lesion in the posterior left frontal lobe, which probably represents an area of active plaque or a recent infarct."

"A determination made by another agency regarding a claimant's disability is not binding on the Social Security Administration, 20 C.F.R. § 404.1504,[16] however, 'it is entitled to some weight and

---

[16]20 C.F.R. § 404.1504 was subsequently amended and states in pertinent part:

should be considered.'" Claymore v. Astrue, 519 F. App'x 36, 38 (2d Cir. 2013) (citation omitted).

The ALJ did not specifically mention the State of Connecticut decision but did refer to the plaintiff's application to the state agency. (R. at 18.) In addition, the ALJ specifically considered and discussed the information provided to the State of Connecticut.[17] Under these circumstances, the ALJ's failure to detail his analysis of the state agency's decision is not grounds for reversal. See Claymore v. Astrue, 519 F. App'x 36, 38 (2d Cir. 2013)("we find no error where, although not specifically mentioned, the VA determination was clearly considered by the ALJ, who thoroughly discussed the other VA records in its findings.").

In a related argument, the plaintiff asserts that the ALJ improperly considered the plaintiff's DSS application in which the

---

[I]n claims filed . . . on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4).

[17]Contrary to the plaintiff's argument, the record is silent as to whether the state agency and SSA apply the same standards. It also is not clear that the two agencies had the same information before them. In addition to the information before the state agency, which, as indicated, the ALJ reviewed, it appears that the ALJ had additional information including the opinions of state agency physicians Drs. Bennett and Wurzel as well as the plaintiff's testimony at the hearing.

plaintiff set forth the amount of time he spent on certain activities.

On the form, the plaintiff was asked to state the amount of time he spent on various activities. The options were "often," "sometimes" or "never." The plaintiff checked "often" to show the amount of time he spent sitting, standing, walking, bending, lifting, grasping, pushing, and pulling. (R. at 299.) He indicated that he could walk and noted that he used a cane, could shop for food, cook, perform household chores, and exercise. (R. at 299.) The ALJ found that these responses were inconsistent with the plaintiff's allegations of disabling limitations.

The plaintiff argues that the ALJ should not have considered the plaintiff's answers in assessing his credibility because, among other things, the form does not specify "how frequently or how long [he] can" do these activities. (Doc. #22 at 26.)

The ALJ's consideration of the form is not grounds for remand. The plaintiff's responses were not the sole evidence used by the ALJ in assessing the plaintiff's credibility. Rather, the ALJ concluded that the medical record as a whole did not substantiate the plaintiff's alleged limitations. The ALJ did not err in concluding that the plaintiff's activities were inconsistent with his allegations of disabling symptoms. See Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)("It is the function of the [Commissioner], not [reviewing courts], to

resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.")

D.  Mischaracterization

The plaintiff asserts that the ALJ mischaracterized the record.

The plaintiff first contends that the ALJ "overlooked direct evidence of difficulty writing which supports credibility regarding functional limits due to tremor." (Doc. #22 at 27-28.)  The court disagrees.

The ALJ noted the plaintiff's allegations that he had difficulty writing as well as the medical evidence documenting tremor and concluded that the plaintiff was limited to occasional fine manipulation in his right hand.  Drs. Bennett and Wurzel both opined that the plaintiff was limited to occasional fine manipulation in his right hand.  Substantial evidence supports this assessment.  The ALJ did not err in not finding a greater limitation.

The plaintiff also takes issue with the ALJ's statement that the plaintiff "has not had the type of medical treatment one would expect for a totally disabled individual and the overall medical record revealed that his medical condition improved with treatment compliance." (Doc. #22 at 17, R. at 17.)  The plaintiff contends that such a statement is impermissible and argues that "the medical records contain no information showing meaningful or measurable

improvement" as to his tremor.  (Doc. #22 at 29.)

Contrary to the plaintiff's argument, the ALJ did not "play doctor" or improperly act as a medical expert in evaluating the evidence.  (R. at 19.)  The challenged statement was made in the context of the ALJ's assessment of the plaintiff's credibility, not in isolation.  In assessing the plaintiff's credibility, the ALJ noted that the medical evidence did not support the plaintiff's allegations.  The ALJ observed that the plaintiff stopped working because his job was seasonal, not for impairment-related reasons. He further noted that the record demonstrated that the plaintiff's tremor was limited to his right hand, not bilaterally as alleged. With regard to his medication, the plaintiff testified at the hearing it did not help his tremor at all.  (R. at 430.)  However, the ALJ properly pointed out that there was record evidence to the contrary.  The plaintiff told Dr. Zhang that he thought the medication "helps partially" (r. at 332, 335, 338) and that he had "less tremor" since taking Mysoline.  (R. at 338.)

The nature and type of treatment a claimant receives is a proper consideration in making a determination as to the credibility of a claimant's subjective complaints.  See SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996).  The ALJ did not consider improper evidence in making his credibility determination. He determined that the plaintiff's account of his symptoms and limitations was not credible in light of the objective clinical

evidence and treatment notes, as he is permitted to under SSR 96-7p.

E.  <u>Step 5</u>

The plaintiff argues that at Step 5 the ALJ improperly relied on VE testimony in determining that the plaintiff is capable of performing other work that exists in significant numbers in the national economy.

During the hearing, the ALJ asked the VE to consider a hypothetical individual of the same age, education, work experience with an RFC of medium work with "occasional fingering or fine manipulation of tasks involving the right upper extremity." (R. at 453.)  The VE responded that such an individual could perform work as a hand packer, DOT code 920.587-018; laundry worker, DOT code 361.684-014; and a cleaner, DOT code 323.687-010.  The VE stated that her testimony was consistent with the DOT.

The plaintiff first argues that the jobs identified by the VE were "not responsive to the ALJ's hypothetical" because they had requirements that the plaintiff could not meet.  In support, the plaintiff points to descriptions of these jobs contained in the Occupational Information Network ("O'Net").  The defendant responds that the plaintiff's reliance on O'Net is misplaced and that the appropriate reference is to the Dictionary of Occupational Titles, citing <u>Ryan v. Astrue</u>, 650 F. Supp. 2d 207, 218 (N.D.N.Y. 2009)("Even if the VE's testimony was in conflict with O'Net, there

is no requirement that the VE's testimony comply with that database. Instead, the VE's testimony must comply with the DOT.") See also SSR 00-4P, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000)("In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy.") As to the DOT descriptions, the defendant points out that the job of cleaner requires "occasional" fingering, which conforms to the plaintiff's RFC as stated in the hypothetical the ALJ posed to the VE.[18] The court agrees that the ALJ did not err at step 5 and that there is no conflict between the DOT and the VE's testimony.[19]

## VII. Conclusion

For these reasons, the plaintiff's motion to reverse and/or remand the Commissioner's decision (doc. #22) is denied and the

---

[18]"The Commissioner need show only one job existing in the national economy that [plaintiff] can perform." Bavaro v. Astrue, 413 F. App'x 82, 384 (2d Cir. 2011). See Martin v. Comm'r of Soc. Sec., No. 5:06CV720(GLS/DEP), 2008 WL 4793717, at *12 (N.D.N.Y. Oct. 30, 2008) ("even the finding that one job exists in sufficient numbers in the national economy capable of being performed by the plaintiff is sufficient to sustain the Commissioner's burden at step five.")

[19]The plaintiff also argues that the VE's testimony is not supported by substantial evidence because the ALJ's hypothetical question did not incorporate all the plaintiff's limitations. (Doc. #22 at 12.) Because the court concludes that the ALJ did not err in not including additional limitations, it need not address this claim.

defendant's motion to affirm the decision of the Commissioner (doc. #23) is granted.

SO ORDERED at Hartford, Connecticut this 9th day of September, 2018.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge